# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00280-COA

DE'ANDRE DAMPIER A/K/A DEANDRE                     APPELLANT
DAMPIER

v.

STATE OF MISSISSIPPI                                            APPELLEE

DATE OF JUDGMENT:               03/01/2021
TRIAL JUDGE:                    HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:      RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                                BY: GEORGE T. HOLMES
                                TAMARRA A. BOWIE
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: ALEXANDRA RODU ROSENBLATT
DISTRICT ATTORNEY:              JOHN K. BRAMLETT JR.
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 10/04/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

CARLTON, P.J., FOR THE COURT:

¶1.     On July 8, 2004, Harry McGuffee Jr. was shot and killed at his business, Five Star

Auto Sales. Two cars were stolen from his car lot. De'Andre Dampier and Jermaine Rogers

were indicted for capital murder and conspiracy to commit murder. Dampier was sixteen

years old on the date of the crime, and Rogers was twenty-one. Rogers subsequently pleaded

guilty. Dampier was tried before a Rankin County Circuit Court jury and was convicted of

capital murder. The Rankin County Circuit Court sentenced Dampier to life imprisonment

without eligibility for parole in the custody of the Mississippi Department of Corrections

(MDOC). Dampier's conviction and sentence were affirmed by the Mississippi Supreme Court. *Dampier v. State*, 973 So. 2d 221, 237 (¶44) (Miss. 2008).

¶2. Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 4607 (2012), the supreme court granted Dampier leave to file a motion for post-conviction relief (PCR)[1] in the Rankin County Circuit Court based on *Miller*. The circuit court subsequently entered an agreed order vacating Dampier's sentence and setting the case for a *Miller* sentencing hearing. Dampier moved for jury sentencing with respect to that hearing, which the circuit court denied. Dampier also filed motions for funds for a mitigation investigator and a psychologist to assist in his preparation for the *Miller* sentencing hearing. The circuit court granted the motions in part.

¶3. After an evidentiary hearing, the circuit court assessed the *Miller* factors and found they weighed in favor of a sentence of life without parole. The circuit court therefore denied Dampier's request to be re-sentenced to a term of life imprisonment with eligibility for parole.

¶4. On appeal, Dampier asserts that the circuit court's decision must be reversed because (1) he has a statutory right to be re-sentenced by a jury; (2) his life-without-parole sentence is disproportionate as a matter of law; (3) his Sixth and Fourteenth Amendment rights were violated when the circuit court denied adequate funding for an investigator; (4) the circuit

---

[1] *See* Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 to 99-39-29 (Rev. 2020).

2

court applied the "wrong legal standard" in sentencing him to life without parole; and (5) sentencing a minor to life without parole is "categorically" unconstitutional in all cases. For the reasons explained below, we conclude that Dampier's assignments of error are without merit and that the judgment of the circuit court must be affirmed.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I. The Crime, Trial, and Direct Appeal

¶5. McGuffee was shot and killed at his car dealership, Five Star Auto, and two cars were stolen from the lot. The crime occurred on July 8, 2004. On February 9, 2005, Dampier, who was sixteen years old at the time of shooting, was indicted along with twenty-one-year old Rogers for capital murder and conspiracy to commit murder for McGuffee's death. Rogers pleaded guilty; Dampier's case was tried before a Rankin County jury beginning August 29, 2006.

¶6. At trial, the State presented two statements that Dampier gave to police shortly after the shooting (dated July 9 and July 23, 2004), in which Dampier described his involvement in the crime at Five Star Auto. In his July 23, 2004 statement, Dampier said:

> [Rogers] called me [on July 6, 2004] and he told me that he wanted me to come help him pick up these cars . . . . [H]e said Five Star [Auto Sales] . . . . Then I said how you gonna get 'em and he said I'm gonna buy 'em . . . . Then he said, [h]ow we gonna do is, I'm gonna get you to drive me up there, then I'm gonna get you to go to the store and park the car. Naw, that my [Dampier's] girlfriend [Tamesha McClendon] stays close over. I said take the cars to her house which is Indian Creek Apartments.

¶7. Dampier stated that on the morning of July 8 (the day of the shooting), Rogers came

3

to Dampier's house and said, "Ready? Alright good . . . so I put my shirt on. He went outside to the car, ready." As Dampier was walking outside toward the car, he said he saw that "[Rogers], he'd got his gun and he'd put it inside his pants. And he putting his shirt over it so I went on and got in the car. So we drove off . . . and so I asked him, . . . Maine, why'd you got your pistol with you?[2] He said: No reason." "So," Dampier said, "I didn't say nuttin' else about it."

¶8.     Dampier said he drove the car (a blue Toyota Corolla) to Five Star Auto because "it had been a while since I had drove a stick." When they got to Five Star Auto, Dampier said he "was about to turn in and [Rogers] said: "N'aw, don't pull in, pull right here which is right there in front of the place," blocking the gate.[3] Dampier said that he then "let [Rogers] out. So [Rogers] walked inside the building [on the car lot]. Then him and the man [McGuffee] came out and checked out the Mustang." Dampier said that no one other than McGuffee was at the car lot at the time.

¶9.     Dampier sat in the car (in front of the entrance gate) and could see that McGuffee and Rogers had "[o]pened the door [of the green Mustang] and popped the hood," and then "[Rogers] pulled his hand up for me to leave and go to Indian Creek apartments." Rebecca

---

[2] Mark Dwayne Hankins testified that he had loaned his .22-caliber pistol to Rogers on July 7, 2004. According to Hankins, Rogers said he needed the gun because "he was going fishing and there were snakes and alligators where he was going."

[3] Captain Andrew Barrett of the Florence Police Department testified that in his July 9, 2004, interview, Dampier said that "at Five Star . . . he went to turn into the parking lot, and [Rogers] told him, 'you need to stop right here at this gate,' blocking the gate."

Wood testified that she drove past Five Star Auto "around 11:00 [a.m.]" She said that she "was going to make a payment," but when she "got to Five Star, there was a medium blue[-]colored car parked in the driveway that was kind of cross-ways[, so] . . . I didn't stop, I just kept going." She also testified that "Mr. McGuffee was standing out front of a Mustang with the hood up with a black gentleman's back to [Highway] 49." Wood said that the black gentleman was "about 5'10" or 5'11"." Investigator Eklund of the Rankin County Sheriff's Office testified that according to the booking sheets for Rogers and Dampier, "[t]he height of Mr. Rogers is 5'6", recorded weight of 210 pounds. The recorded height of Mr. Dampier is 6'0"[,] . . . 200 pounds."

¶10.    As noted, Dampier said he left Five Star Auto after Rogers waved him on and went to Indian Creek apartments. Indian Creek apartments are located on Highway 49 south of Five Star Auto. Dampier's girlfriend, McClendon, lived there.

¶11.    In his July 9, 2004 statement, Dampier said that when he got to his girlfriend's apartment, he "told [McClendon] about what was goin' on down there[, Rogers] wanted me to come get these cars for him and stuff, I told her that he had a pistol. I didn't know he say what he was gonna do with it, he said he wouldn't gonna do nothing with it[.]"

¶12.    Then, according to Dampier, "within no time, [Rogers] came back, he picked me up [in the Mustang]." Dampier accompanied Rogers back to Five Star Auto in the green Mustang, Rogers gave him a key to a black Jeep Cherokee on the lot, and Dampier got in it. Dampier said that after they drove through the entrance as they were leaving (Rogers driving

5

the Green Mustang and Dampier following him driving the black Jeep Cherokee), Rogers stopped, got out of his car, and closed the entrance gate. Dampier asked Rogers, "[W]hat'd you close the gate for? He said, "Dude, this dude's in a hurry and [Rogers] had the keys and [McGuffee] wanted me to lock up after I get the Jeep.'" Joe Ishee testified that he drove past Five Star Auto at around 11:25 a.m. and noticed "a big colored man closing the gate. When I come by there he was closing that white gate, and he went through there. And there was an SUV, a dark-colored vehicle there."

¶13. Upon leaving Five Star Auto, Dampier said he followed Rogers southbound on Highway 49 to Rogers's apartment. At trial, Richard Vorder Bruegge, Ph.D., was accepted as an expert in forensic image analysis and video analysis. He reviewed surveillance video retrieved by law enforcement from a business south of Five Star Auto on the southbound side of Highway 49. Bruegge limited his focus to southbound traffic, explaining that the video quality was too poor for him to reach any conclusions about northbound vehicles.

¶14. Bruegge concluded that both the green Mustang and the black Jeep Cherokee traveled southbound on Highway 49 only one time between 11:00 a.m. and 12:00 p.m. on July 8, 2004. As to the green Mustang, Bruegge testified that, if it "came down [Highway 49] in that period from 11:00 a.m. to 12:00 p.m., then it was at . . .11:25:32." Regarding the black Jeep Cherokee, Bruegge "found two instances in which there was a vehicle that was consistent with the black Jeep . . . . One of them is at 11:25:42, and the other one was at 11:23." Bruegge concluded that if the black Jeep Cherokee followed the green Mustang, as Dampier

6

described in his statements, it did so at 11:25:42.

¶15.    Dampier stated that when they got to Rogers's apartment, Rogers asked him to fill out the title applications for the Mustang and the Cherokee "cause his wife knew his handwriting." After Dampier completed the title applications, Dampier said that Rogers signed McGuffee's name on both of them. While they were at the apartment, Rogers received a phone call. Dampier said that after Rogers got off the phone, Rogers told him that McGuffee "had been shot. And so like . . . I [said], what'd they kill him for. He told me that they found some drugs on him and they had stole a Crown Vic from his lot." Later that day, Dampier confronted Rogers and said, "[N]ow Maine, you know we boys and all that, and I asked him, Jermaine, did you kill that dude? And I was like, be for real with me. He was like, Naw, I didn't kill that dude and stuff like that." At the end of his July 23, 2004 statement, Dampier was asked if he had anything more to add. Dampier stated, "I didn't have nothing to do with it."

¶16.    Captain Andrew Barrett of the Florence Police Department testified that the Mustang and the Jeep Cherokee were recovered at Eastside Apartments where Rogers lived. The police collected clothes and shoes from Dampier's and Rogers's homes. Investigator Eklund testified that a pair of Rogers's shoes had McGuffee's blood on them. Dampier's clothes and shoes were also tested; although they had human blood on them, McGuffee's blood was not found on Dampier's belongings. Eklund testified that Dampier's fingerprints were found inside the vehicles and on some items in the vehicles, but his fingerprints were not found on

any other items collected from Five Star Auto. The bullets extracted from McGuffee's head during the autopsy performed by Dr. Steven Hayne were found to be consistent with the gun Hankins loaned to Rogers.

¶17. The State offered the testimony of Kenneth Harth, an inmate in the Rankin County jail who was housed in the same cell block as Dampier. Harth testified:

> [Dampier] got to telling me what had happened in his situation and why he was there. And he told me that he and [Rogers] had planned a robbery, and that [Rogers] had knew the man that owned the car lot, and that they were in need for some money, and that [Rogers] promised him that he would get a truck out of the deal . . . . And he told me that in the process of the robbery, that he had taken cash and that he had taken a cell phone, and that he had drove a vehicle, which was a truck, a Jeep Cherokee, off the lot of the car dealership.

¶18. Harth also testified that Dampier told him "that if [Rogers] had listened to him, that they wouldn't have ever got caught." Elaborating, Harth further testified:

> Basically what [Dampier] was saying was if [Rogers] had listened to him, because he was the one actually who was supposed to carry out the robbery and stuff and the murder, and [Rogers], I guess, assumed that he could do it and they were going to have to kill the man because the man knew [Rogers]. This is what [Dampier] told me.

¶19. Additionally, Harth testified about a story that Dampier and Rogers planned to use to confuse law enforcement, as follows:

> [STATE:] And was there a story that they were supposed to stick to to keep law enforcement from figuring out who actually committed the murder and robbery?
>
> [HARTH:] Yes. [Dampier] had said that [Rogers] was saying he did it and he was saying [Rogers] did it. That's what he told me, that he was telling the people [Rogers] did it and [Rogers] was telling the people he did it, so nobody would know actually who was

8

the trigger man. Then [Dampier] also went on to say later on that he was going to change his story and tell the people that [Rogers] made him do it, that he didn't know [Rogers]. Then he turned around and told me again he was going to change it and say he didn't know that [Rogers] was going to do that.

¶20. Harth confirmed that he did not strike a deal, or ask for a deal, in giving information to the authorities, and that he had served his time in Mississippi for the crime he committed here. When Harth completed his sentence in Mississippi, he returned to jail in Tennessee (his home state) because his suspended time was revoked on his prior Tennessee felony convictions for habitually driving without a valid license.

¶21. After the State rested, the defense tendered Robert Breithaupt, owner of Breithaupt Southern Images Photography and Video, who was accepted as an expert in video analysis. Unlike Bruegge (the State's expert in forensic image and video analysis), Breithaupt did not limit his conclusions to southbound vehicles. In his opinion, a vehicle consistent with the green Mustang was traveling southbound at 11:18 a.m. and northbound at 11:22 a.m. The defense presented no other witnesses.

¶22. The jury convicted Dampier of capital murder on September 1, 2006. The trial court sentenced Dampier to life imprisonment without eligibility for parole, with the judge observing that "I've seen a lot of defendants, and I've handed down a lot of sentences, and this sentence is as justified as any of them that I've ever handed down." The Mississippi Supreme Court affirmed Dampier's conviction and sentence on direct appeal. *Dampier*, 973 So. 2d at 237 (¶44).

## II.    Post-Trial Motions

¶23.    In 2014, the Mississippi Supreme Court granted Dampier leave to file a PCR motion in the circuit court based on the United States Supreme Court's 2012 decision in *Miller*. *See* Order, *Dampier v. State*, No. 2013-M-00808 (November 13, 2014). The circuit court entered an agreed order vacating Dampier's sentence and setting the case for a hearing pursuant to *Miller*. Motions relevant to this appeal were subsequently filed, as described below and discussed in detail as necessary in our analysis.

### A.    Motion for Jury Sentencing

¶24.    On August 10, 2018, the defense filed a "Motion for Sentence of Life with the Possibility of Parole or, in the Alternative, for Jury Sentencing Hearing Pursuant to Miss[issippi] Code [Annotated section] 99-19-101." Dampier asserted, among other issues, that he had a statutory right to jury sentencing at his *Miller* hearing. On August 12, 2020, the circuit court set the motion for hearing and ordered the parties to file briefs "in opposition or to support the motion including any intervening decisions by the appellate court." The court heard arguments concerning jury sentencing on August 31, 2020, and denied Dampier's motion. On March 4, 2021 (after the *Miller* hearing), the circuit court issued another written order denying Dampier's motion.

### B.    Defense Motions for Expert Funding

¶25.    On August 24, 2016, Dampier filed a "Motion for Funds for Expert Assistance in the Field of Mitigation Investigation" to develop mitigation evidence to be presented at his

*Miller* hearing. The circuit court continued the *Miller* sentencing hearing several times because the defense had not yet retained a mitigation expert. On January 17, 2019, Dampier (represented by new counsel) filed an "Amended Motion for Funds for Expert Assistance in the Field of Mitigation Investigation" requesting the appointment of Jennifer L. Hoff from Inquisitor for 150 to 200 hours at a reduced rate of $65 an hour. In March 2019, the circuit court signed an "Agreed Order Granting Funds in the Field of Mitigation Investigation" approving three thousand dollars to retain Hoff.

¶26.    On March 16, 2020, at a hearing on other matters, defense counsel informed the circuit court that the mitigation investigator needed additional funds to locate and interview four witnesses and complete her investigation. Defense counsel told the circuit court she was waiting for Hoff to provide her more information, so the circuit court instructed the parties to file any additional motions by the next status conference. The record reflects that defense counsel did not file a motion for additional funds for a mitigation expert, or any information that would support a request for additional funds for Hoff.

¶27.    On August 25, 2020, Dampier filed a "Motion for Funds for Expert Assistance in the Field of Psychology" asking for $3,000 to retain Dr. Lott to evaluate Dampier with respect to the *Miller* factors. At a hearing held on August 31, 2020, the circuit court granted the motion for funds for Dr. Lott, awarding $1,000.

¶28.    At another hearing about three months later, defense counsel told the circuit court that Dr. Lott refused to do Dampier's mental evaluation for $1,000. The circuit judge asked,

"Didn't I give several thousand dollars on something else, too?" Defense counsel responded, "Yes. [Dampier] was given $3000 [for] the mitigation expert. But he needs a mental eval[uation] as well." The circuit judge sought clarification, asking, "When you say he needs a mental evaluation, do you mean he is not competent to proceed?" The defense responded, "No . . . under the *Miller* test he is allowed to have a mental expert as well." In the end, the circuit judge treated the defense's request as an ore tenus motion for additional expert funds, and denied that request:

> All right. This is where we are. I understand that the State Public Defender is training all public defenders to handle these cases as though they are death penalty cases. This is not—this is PCR. It's not a death penalty type case. This Court has already granted $4000 in experts to this Defendant, which is more than courts in this district have routinely granted in death penalty cases. So I'm going to treat it as a motion for additional funds, and the Court would deny that motion.

The circuit court issued its written order denying the defense's request for additional expert funds that same day. Defense counsel secured funds to retain Dr. Lott through grant funding available through the Southern Poverty Law Center, and Dr. Lott testified at Dampier's *Miller* sentencing hearing.

### C. The *Miller* Sentencing Hearing

¶29. On February 23, 2021, the circuit court held an evidentiary *Miller* sentencing hearing. The State entered five exhibits into the record, namely the trial transcript of the 2006 capital murder trial; Dampier's July 9, 2004, statement; Dampier's July 23, 2004, statement; Dampier's MDOC records; and Dampier's records from the Rankin County Jail. The State

12

did not call any witnesses.

¶30.  The defense called two witnesses, Sergeant Demetre Apostolidis, who testified about his interactions with Dampier at the Rankin County Jail, and Dr. Lott, who was accepted as an expert in the field of forensic psychology and testified about his evaluation of how the *Miller* factors applied to Dampier. At the end of the hearing, the circuit court reviewed the *Miller* factors and determined that the factors weighed in favor of a life-without-parole sentence.  The circuit court imposed that sentence and denied Dampier's request that he be sentenced to life imprisonment with eligibility for parole.

¶31.  Dampier appealed, raising the issues listed above.

## STANDARD OF REVIEW

¶32.  "[T]here are two applicable standards of review in a *Miller* case.  First, whether the trial court applied the correct legal standard is a question of law subject to de novo review." *Dotson v. State*, 328 So. 3d 659, 665 (¶23) (Miss. Ct. App. 2021) (quoting *Chandler v. State*, 242 So. 3d 65, 68 (¶7) (Miss. 2018)), *cert. denied*, 329 So. 3d 1200 (Miss. 2021).  Second, "[i]f the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Id.*  The standard of review with respect to other issues will be addressed in the relevant discussion section.

## DISCUSSION

¶33.  In his fifth assignment of error, Dampier asserts that sentencing a juvenile to life without parole is "categorically" unconstitutional in all cases. This Court and the Mississippi

13

Supreme Court have previously considered and rejected this assertion. *See McGilberry v. State*, 292 So. 3d 199, 205-06 (¶¶25-27) (Miss. 2020), *cert. denied*, 328 So. 3d 1251 (Miss. 2021); *Wharton v. State*, 298 So. 3d 921, 926 (¶22) (Miss. 2019) (recognizing that "neither *Miller* nor *Montgomery* [*v. Louisiana*, 577 U.S. 190 (2016),] mandate a categorical bar on life without parole for juveniles"); *Miller v. State*, 327 So. 3d 121, 128 (¶23) (Miss. Ct. App. 2020); *Booker v. State*, No. 2018-CA-00664-COA, 2019 WL 13161100, at *3 (Miss. Ct. App. Sept. 3, 2019), *as modified on rehearing* (April 4, 2022); *see also Jones v. Mississippi*, 141 S. Ct. 1307, 1316 (2021) (recognizing that *Miller* does not impose a categorical bar against life without parole for juveniles "because *Miller* said so: 'Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* [*v. Simmons*, 543 U.S. 551 (2005),] or *Graham* [*v. Florida*, 560 U.S. 48 (2010)]'" (quoting *Miller*, 567 U.S. at 483)). This assertion requires no new discussion, and therefore we focus on Dampier's remaining four arguments.

## I.     Whether Dampier has a statutory right to jury re-sentencing.

¶34.    Relying on *Moore v. State*, 287 So. 3d 905 (Miss. 2019), Dampier asserts that he should have been re-sentenced by a jury pursuant to Mississippi Code Annotated Section 99-19-101(1) (Rev. 2020) because he was convicted of capital murder. This argument has been rejected by both the Mississippi Supreme Court and this Court. We likewise do so here for the reasons addressed below.

¶35.    Section 99-19-101(1) provides in relevant part:

> Upon conviction or adjudication of guilt of a defendant of capital murder, . . . the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.

¶36. In *Moore*, the supreme court held that section 99-19-101(1) governs the *initial sentencing* of "a minor convicted of capital murder **post-*Miller*.**" *Id.* at 919 (¶57) (emphasis added). The supreme court explained that this is so, notwithstanding its "decision in *Pham v. State* [that] authorizes a common practice among trial courts of sentencing a defendant in a capital case after a jury trial in which the death penalty is not sought despite the contrary language found in Section 99-19-101." *Id.* at (¶55) (citing *Pham v. State*, 716 So. 2d 1100, 1103-04 (¶¶21-24) (Miss. 1998)). With respect to adult offenders, "[t]his authority . . . is vested in the trial court because the parole statutes leave only one sentencing option," *id.*, but "[i]n the sentencing of a juvenile, capital-murder offender, . . . more than one sentence is possible due to *Miller*." *Id.* (citation omitted). As such, a minor "convicted of capital murder post-*Miller*" has a statutory right to have a jury determine "whether [he] should be sentenced to life imprisonment without parole or life imprisonment with eligibility for parole." *Id.* at (¶59).

¶37. In reaching this conclusion, the supreme court distinguished Moore's situation (denial of *initial sentencing* by a jury under Section 99-19-101) from cases "in which defendants sought *resentencing* by a jury post-*Miller*," *id.* at (¶57) (emphasis added), as Dampier does in the case before us. The supreme court explicitly stated that "our holding today is limited

15

to the facts of this case: a minor convicted of capital murder post-*Miller* who was denied sentencing by a jury." *Id.* In short, the supreme court did not address "scenarios in which defendants [seek] resentencing by a jury post-*Miller*," *id.*, like Dampier.

¶38. After *Moore* was decided, the supreme court addressed the question whether resentencing by a jury is required when a prisoner seeks post-conviction relief based upon *Miller*, and his conviction and sentence were already final when *Miller* was decided. *Wharton*, 298 So. 3d at 923 (¶¶1-4). Wharton was tried for capital murder in 1995 when the death penalty was still an option. *Id.* at (¶5). *Roper v. Simmons*, 543 U.S. 551 (2005), prohibiting the imposition of the death penalty for defendants under the age of eighteen when they committed their crimes, had not yet been decided. Thus Wharton's initial sentencing was before a jury pursuant to section 99-19-101. *Id.* at (¶6).

¶39. The supreme court held that "while we find that Wharton is entitled to a *Miller* hearing, we do not find that he is entitled to a *Miller* hearing in front of a new jury." *Id.* at 925 (¶20). The supreme court determined that under the United States Supreme Court's decisions in *Miller* and *Montgomery*, "prisoners like [Wharton] must be given the opportunity to show their crime did not reflect irreparable corruption," *id.* at 927 (¶25) (emphasis omitted) (quoting *Montgomery*, 577 U.S. at 213), and "Mississippi's PCR statute provides this opportunity to prisoners, such as Wharton, whose convictions and sentences were final when *Miller* was decided." *Id.* at (¶26). In this regard, such prisoners are not entitled to resentencing before a jury but, instead, are "entitled . . . to an evidentiary hearing

16

in the trial court, at which that court [will] consider and apply the *Miller* factors." *Id.* at 928 (¶32).[4]

¶40.    Faced with the same circumstances in *McGilberry*, 292 So. 3d at 208 (¶37), the supreme court again concluded:   "While *Miller* requires an individualized sentencing hearing, there is no constitutional or statutory right to a jury for that hearing.  Therefore, the trial court did not err by denying McGilberry's motion to be re-sentenced by a jury."  In *McGilberry*, "[a] jury found McGilberry guilty of four counts of capital murder and sentenced him to death." *Id.* at 200 (¶1).  Post-*Miller*, McGilberry was granted permission to seek PCR relief from his death sentence. *Id.* at (¶2).

¶41.    McGilberry subsequently filed a motion to have a jury resentence him. *Id.* at (¶3). The supreme court affirmed the trial court's ruling that "McGilberry had no right to a jury for his *Miller* hearing." *Id.* at 200-01 (¶¶3-4).  In reaching this conclusion, the supreme court recognized that section 99-19-101 allowed McGilberry, convicted of four counts of capital murder, the right to be sentenced by a jury at his *original* sentencing hearing. *Id.* at 201 (¶4). "But this statute is silent about *and thus extends no rights* to the scenario we face here—post-conviction review of [a] life-without-parole sentence following [Miller's] new substantive rule of constitutional law." *Id.*  (emphasis added).

---

[4] The dissent disagrees with the *Wharton* Court's analysis on this point, and likewise the dissent disagrees with our analysis that is based on this clear precedent, as well as the precedent set by the supreme court's decision in *McGilberry*, and our own decision in *Martin*. *See post* at ¶102.  For the reasons detailed above, we find that this precedent amply supports our analysis and decision in this case.

¶42.   In *Martin v. State*, 329 So. 3d 451 (Miss. Ct. App. 2020), *cert. denied*, 329 So. 3d 1201 (Miss. 2021), this Court discussed and followed the supreme court's decisions in *Moore*, *Wharton*, and *McGilberry* under circumstances like those in Dampier's case.  In 2002, a Jackson County jury found Martin guilty of "capital felony murder with the underlying felony of robbery." *Id.* at 454 (¶3).  Just as in Dampier's case, "[a]fter the State announced that it would not seek the death penalty, the circuit court sentenced Martin to a term of life imprisonment without eligibility for parole, which was then the only possible sentence." *Id.*; *see Pham*, 716 So. 2d at 1103 (¶21).

¶43.   After *Miller* was decided, the supreme court granted Martin leaven to file a PCR motion in the trial court, and the trial court subsequently entered an agreed order vacating Martin's sentence for a new sentencing hearing pursuant to *Miller*. *Id.* at 454 (¶4).  The trial court denied Martin's request for jury sentencing, *see id.* at 458 (¶15), and "[f]ollowing an evidentiary hearing, the court held that Martin was not entitled to relief under *Miller* and re-sentenced him to a term of life imprisonment without eligibility for parole." *Id.*  On appeal, Martin asserted that the trial court erred in denying his request for a jury sentencing hearing. *Id.* at 455 (¶7); *see id.* at 458 (¶15).

¶44.   This Court unanimously held that the trial court properly denied Martin's request for a jury after thoroughly discussing *Moore*, *Wharton*, and *McGilberry*. *Id.* at 455-58 (¶¶8-15). Like Dampier in this case, "Martin [sought] to distinguish his case from *Wharton* on the ground that he ha[d] never had a jury sentencing hearing, whereas Wharton was originally

18

sentenced by a jury." *Id.* at 457 (¶14). This Court held, however, that this distinction has no

"legal significance." *Id.* We explained that the only reason Wharton (or McGilberry) were

sentenced by a jury was because the State originally sought the death penalty in their cases.

*Id.* In contrast, "there was no [jury] sentencing hearing at Martin's trial in 2002 because the

State . . . [did] not seek the death penalty[,]" leaving life without parole as the only possible

sentence. *Id.* at 457-58 (¶14) (citing *Pham*, 716 So. 2d at 1103 (¶21)).

¶45. We then concluded:

> It is true that Martin would be sentenced by a jury if his trial were held today. *Moore*, 287 So. 3d at 919-20 (¶¶58-59). However, our Supreme Court has now held that prisoners whose convictions and sentences were already final when *Miller* was decided are not entitled to be re[-]sentenced by a jury. *McGilberry*, 292 So. 3d at 201, 208 (¶¶4, 37); *Wharton*, 298 So. 3d at 927-28 (¶¶26-29). Those offenders are instead entitled to an evidentiary hearing before a judge. *Wharton*, 298 So. 3d at 927-28 (¶¶26-29) . . . . Therefore, the circuit judge did not err by denying Martin's request for a jury sentencing hearing.

*Id.* at 458 (¶15).

¶46. Dampier makes the same argument as Martin (i.e., that his case is different from

*Wharton* and *McGilberry* because "[he] never received a jury sentencing hearing"). As in

*Martin*, we likewise hold here that this distinction has no "legal significance." *Martin*, 329

So. 3d at 457 (¶14).[5] Under *Wharton*, *McGilberry*, and *Martin*, Dampier was not entitled to

a jury at his post-conviction *Miller* hearing. *McGilberry*, 292 So. 3d at 207 (¶33); *Wharton*,

---

[5] The dissent asserts that this analysis in *Martin* is erroneous. *See post* at ¶101. We disagree and find the analysis in *Martin* wholly applicable here as detailed above.

298 So. 3d at 927 (¶26); *Martin*, 329 So. 3d at 458 (¶15); *see Booker*, 2019 WL 13161100, at *6 (¶¶24-25).

¶47.    Dampier also asserts that he was entitled to jury sentencing because the circuit court entered an agreed order vacating his original sentence for a new sentencing hearing. When this order became final after the State did not appeal it, Dampier asserts that he was then no longer seeking post-conviction relief, but rather was a defendant entitled to a criminal sentencing hearing pursuant to section 99-19-101. But orders vacating the prisoners' sentences were also entered in *Wharton*, 298 So. 3d at 926 (¶22), *McGilberry*, 292 So. 3d at 206 (¶29), and *Martin*, 329 So. 3d at 454 (¶4). In both *Wharton* and *McGilberry*, the supreme court held that the circuit court erred by vacating the prisoner's sentences prior to holding a PCR hearing. Nevertheless, the supreme court essentially disregarded the error and analyzed the hearing in the circuit court as a PCR hearing—not a new, de novo sentencing hearing. *Wharton*, 298 So. 3d at 926-28 (¶¶22-29); *McGilberry*, 292 So. 3d at 206 (¶29); *see Booker*, 2019 WL 13161100, at *6, n.8. Most recently, in *Alexander v. State*, 333 So. 3d 19 (Miss. 2022), the supreme court did the same thing where, as in *Wharton*, *McGilberry*, and *Martin*, the circuit court granted Alexander's *Miller*-based PCR motion by vacating his life-without-parole sentence and then holding a *Miller* hearing. *Id.* at 30 (¶47). We are, of course, obliged to follow these precedents in this case.[6]

---

[6] The dissent acknowledges the existence of these precedents, but "do[es] not believe this Court should continue to ignore this incongruity." *Post* at ¶104. However, "this Court does not have the authority to overrule or ignore supreme court precedent." *Cahn v. Copac*

¶48.   Lastly, Dampier asserts that the United States Supreme Court's recent decision in *Jones v. Mississippi*, 141 S. Ct. 1307 (2021), "makes clear" that *Wharton* and *McGilberry* were wrongly decided, because, under *Jones*, "the remedy for a *Miller* violation is a new sentencing hearing where 'the sentencer has discretion to "consider the mitigating qualities of youth" and impose a lesser punishment.'" *Jones*, 141 S. Ct. at 1314 (quoting *Miller*, 567 U.S. at 476)).   Quoting the statement from *Jones* that "*Miller* 'require[s] a sentencing procedure similar to the procedure that this Court has required for the individualized consideration of mitigating circumstances in capital cases,'" *Jones*, 141 S. Ct. at 1315, Dampier asserts that this individualized sentencing requirement "cannot be satisfied in a post-conviction evidentiary hearing[.]"  We find this assertion is without merit.

¶49.   We find nothing in *Jones* that suggests that the hearing must occur under a state's statutory sentencing scheme and not under a state's statutory post-conviction-relief scheme as described in *Wharton* and *McGilberry*.  To the contrary, the United States Supreme Court in *Jones* specifically recognized that "when 'a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems.'" *Jones*, 141 S. Ct. at 1321 (quoting *Montgomery*, 577 U.S. at 211).  Continuing, the *Jones* Court held, "So it is here.  Because *Montgomery* directs us to 'avoid intruding more than necessary' upon the States, [*Montgomery*, 577 U.S. at 211], and because

_____

*Inc.*, 198 So. 3d 347, 358 (¶35) (Miss. Ct. App. 2015).

21

a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth, we should not now add still more procedural requirements." *Id.*

¶50.    Indeed, post-*Jones*, in *Alexander*, 333 So. 3d at 30-31 (¶¶49-50), the supreme court again found no error in the circuit court denying the defendant's motion seeking jury resentencing under *Miller*.  Alexander was convicted for capital murder for stabbing his mother-in-law to death in 1993 when he was seventeen years old. *Id.* at 21 (¶3).  Alexander had prior convictions and was sentenced by the trial court to life without eligibility of parole as a habitual offender. *Id.* at (¶4). In 2014, the supreme court granted Alexander permission to proceed in the trial court with a PCR motion based on *Miller*. *Id.* at 21 (¶5). The trial court granted Alexander's PCR motion, vacated his sentence, and set a *Miller* hearing. *Id.* at (¶6). "The State and defense counsel had stipulated that the trial court should re-sentence Alexander to life with eligibility for parole on his capital-murder conviction because the sentencing statute for capital murder in 1993 allowed only for either the death penalty or a life sentence,"[7] but the State informed the circuit court "that it intended to prove that Alexander was a habitual offender for purposes [of Mississippi Code Annotated] section 99-19-81 [(Rev. 2020)] and would seek life without parole." *Id.* at (¶7).

¶51.    Alexander moved for jury re-sentencing, "assert[ing] that he was entitled to an individualized hearing before a jury on the habitual-offender sentence, with consideration of

_____

[7] Alexander was convicted of capital murder in 1993. *Id.* at 21 (¶7) & n.2. Section 99-19-101 was not amended until July 1994 to allow life-without-parole sentences, and the State did not seek the death penalty at Alexander's capital murder trial. *Id.*

22

the *Miller* factors." *Id.* at 22 (¶8). The circuit court denied Alexander's motion, *id.*, subsequently held the *Miller* hearing, and "sentenced Alexander to life as a habitual offender under Section 99-19-81, without parole eligibility." *Id.* at 23 (¶16).

¶52. Alexander appealed, asserting, among other issues, that he was denied his "constitutional right to have a jury impose his sentence." *Id.* at 24 (¶20). The supreme court found no error in the trial court denying Alexander's motion for a jury determination of the *Miller* factors,[8] observing that it had "rejected the same argument in [*McGilberry*, 292 So. 3d at 206-07 (¶¶30-32)]." *Id.* at 30 (¶50).

¶53. Directly relevant to Dampier's assertion here, the *Alexander* Court reiterated "that *Miller* does *not* 'impose additional fact-finding before a juvenile offender may receive the greater punishment of life without parole.'" *Id.* (emphasis added) (quoting *McGilberry*, 292 So. 3d at 206 (¶30)). "'Stated differently, the *Miller* factors are not elements of the crime that the sentencer must find beyond a reasonable doubt to impose a life-without-parole sentence.'" *Id.* (quoting *McGilberry*, 292 So. 3d at 207 (¶31)). We find no basis for distinguishing the supreme court's analysis in *Alexander* on this point from the circumstances before us. As the supreme court explained, *Miller* "does *not* 'impose additional fact-finding,'" and "the *Miller* factors are *not* elements of the crime that the sentencer must find beyond a reasonable doubt." *Id.* at 30 (¶50) (emphasis added). Based upon these same

---

[8] The supreme court underwent this analysis separately from its specific discussion about Alexander's sentencing under the habitual-offender statute (section 99-19-81), which is not applicable here.

principles, we find no merit to Dampier's assertion that the "individualized sentencing requirement" referenced in *Jones* "cannot be satisfied in a post-conviction evidentiary hearing."

¶54.   For all the reasons addressed above, we find that Dampier's jury-sentencing assignment of error is without merit.

## II.      Whether Dampier's sentence is disproportionate as a matter of law.

¶55.   Relying on *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller*, Dampier asserts that his sentence must be vacated because, "given his role in this case, a life-without-the-possibility-of-parole sentence is disproportionate and violates the Eight Amendment to the United States Constitution." We find this assignment of error without merit for the reasons addressed below.

¶56.   Dampier was convicted of felony murder—a homicide offense. In *Graham*, the United States Supreme Court recognized that in prior cases it had found that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham*, 560 U.S. at 69.  The Supreme Court then applied this principle to juvenile offenders, who are, by reason of their "lack of maturity" and "susceptibl[ity] to negative influences," *id.* at 68, less culpable than when compared to adults.  The *Graham* Court held "that for a juvenile offender *who did not commit homicide* the Eighth Amendment forbids the sentence of life without parole." *Id.* at 74 (emphasis added).

24

¶57. Importantly, *Graham* did not prohibit life-without-parole sentences for juvenile *homicide* offenders, but rather drew a distinct "line between homicide and other serious violent offenses against the individual." *Id.* at 69 (internal quotation mark omitted). The United States Supreme Court in *Jones* likewise noted this distinction. *Jones*, 141 S. Ct. at 1314.

¶58. Two years after *Graham*, the United States Supreme Court in *Miller* "allowed life-without-parole sentences for defendants who committed homicide when they were under 18, but only so long as the sentence is not mandatory—that is, only so long as the sentencer has discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment." *Jones*, 141 S. Ct. at 1314 (internal quotation marks omitted) (quoting *Miller*, 567 U.S. at 476). As we discuss in further detail in Part IV below, "[t]he *Miller* Court identified several factors that must be considered by the sentencing authority," *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013) (quoting *Miller*, 567 U.S. at 480)—and *one* of the five *Miller* factors requires the sentencer to consider "the circumstances of the homicide offense, including the extent of [the juvenile offender's] . . . participation in the conduct and the way familial and peer pressures may have affected him." *Id.* at 995-96 (¶19) (quoting *Miller*, 567 U.S. at 477).

¶59. But nowhere in *Miller* or *Jones* do we find any authority for the proposition that we must consider the "circumstances-of-the-homicide-offense" factor to the exclusion of the other four factors, or even that additional weight must be given to this factor. Yet by asking

this Court to vacate his sentence due to his purportedly lesser role in the crime, Dampier essentially asks us to do just that. We decline to do so, as we are bound by the federal and Mississippi precedents on this issue that neither authorize, nor require, this Court to give exclusive or priority consideration of this factor.

¶60.   In any event, even if we were to undergo such an analysis, we observe that Dampier faces a heavy burden to prove that his life-without-parole sentence is disproportionate under the circumstances of his case.  As the *Graham* Court explained, "the Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'" *Graham*, 560 U.S. at 59-60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000-01 (1991) (Kennedy, J., concurring in part and concurring in judgment)). We find no "gross[] disproportiona[lity]" here.

¶61.   The record reflects, and the circuit court found, that Dampier participated in planning a robbery of Five Star Auto, knew that Rogers had a gun from the time Rogers arrived at Dampier's house on the morning of the shooting, drove Rogers to Five Star Auto, blocked the gate to Five Star Auto during the robbery, and drove a stolen vehicle from the lot after McGuffee had been murdered.  Further, there is conflicting evidence whether Dampier ever left Five Star Auto during the crime.  Dampier claimed in his statements to the police that he left Five Star Auto after Rogers waved him on and went to McClendon's apartment, where he waited until Rogers picked him up "within no time."  The State's expert forensic image

26

and video analyst, however, testified that based upon his review of Highway 49 video surveillance, both the green Mustang (driven by Rogers) and the black Jeep Cherokee (driven by Dampier) traveled southbound on Highway 49 only one time between 11:00 to 12:00 on July 8, 2004.

¶62. And Harth's testimony about what Dampier told him in prison described an entirely different story than what Dampier told police. Harth said that Dampier told him "he and [Rogers] had planned a robbery . . . and in the process of the robbery, that he [(Dampier)] had taken cash and that he had taken a cell phone" as well as the black Jeep Cherokee. Additionally, according to Harth, Dampier knew that in carrying out the robbery, "they [(Dampier and Rogers)] were going to have to kill the man [(McGuffee)] because the man knew [Rogers]." Lastly, Harth said that Dampier told him the different versions of his "story" that he planned to use to confuse law enforcement and cast the blame for the shooting on Rogers. Although Dampier attacks Harth's credibility as a "jailhouse snitch," the record reflects, and the jury heard, Harth confirm that he did not strike a deal, or ask for a deal, in giving information to the authorities.

¶63. Further, the transcript from Dampier's capital murder sentencing hearing reflects that the circuit judge, when sentencing Dampier to life imprisonment without parole remarked, "I've seen a lot of defendants, and I've handed down a lot of sentences, and this sentence is as justified as any of them that I've ever handed down." Based upon our own review of the record, we do not find that Dampier's life-without-parole sentence is "grossly

27

disproportionate" to his capital murder conviction in this case under *Graham*, *Miller*, and *Jones*.

¶64. For all these reasons, we find that Dampier's disproportionality assignment of error is without merit.

### III. Whether Dampier was wrongly denied "adequate" funds for the mitigation investigator.

¶65. Dampier asserts that he was denied his Sixth and Fourteenth Amendment rights when the circuit court denied "adequate funding" for a mitigation investigator. We find this assignment of error without merit for the reasons addressed below.

### A. Waiver

¶66. First, Dampier never properly sought additional funding for his mitigation expert. The record reflects that in March 2019, the circuit court awarded Dampier $3000 for a mitigation expert, Jennifer Hoff, to develop mitigation evidence to be presented at Dampier's *Miller* hearing. About a year later, at a hearing on other motions, Dampier's counsel alluded to needing additional funds to pay Hoff, as follows:

| [COUNSEL FOR DAMPIER:] | The mitigation expert ha[s] asked for additional funding. |
|---|---|
| THE COURT: | *How much additional funding?* |
| [COUNSEL FOR DAMPIER:] | *She hasn't said.* She just said she needed to interview four more people in his family, and she was having issues with interviewing his mother. Now, I can follow up again. I told her to e-mail me an itemized bill of what she's already taken so that I could present it to the Court, |

28

and I haven't received it yet.

(Emphasis added). Later on in the hearing, the circuit court noted that "[a]s far as the Court ordering more than $3,000, I'm going to have to hear a really, really strong reason why,—this Court has never granted a Defendant more than $3,000. Even in death penalty cases, I haven't seen courts grant more than $3,000 for expert assistance." The circuit court then specifically told counsel to "[s]et this back on settlement day next term for a status conference . . . . If you have motions, they need to [be] filed by that time."

¶67. The record reflects that defense counsel never filed a motion for additional funds for a mitigation expert or even informally furnished the circuit court with any information regarding additional funds for Hoff, whether in writing or ore tenus, at any subsequent hearing.

¶68. And even if the scant information defense counsel offered at the March 2020 hearing could suffice as a "motion" on the request, Dampier's counsel never obtained a specific ruling on that request. Instead, Dampier shifted his focus to obtaining funds for expert assistance in the field of psychology, filing a motion for same in August 2020, and asking for $3,000 to retain Dr. Lott to evaluate Dampier with respect to the *Miller* factors. No mention was made of needing additional funds for Hoff. The circuit court awarded $1,000 "earmarked" for Dr. Lott.

¶69. At a hearing three months later, defense counsel sought additional funds for Dr. Lott and made clear that these funds were not for Dampier's mitigation investigator, Hoff. The

circuit court specifically asked Dampier's counsel, "Didn't I give several thousand dollars on something else, too?" Defense counsel responded, "Yes. [Dampier] was given $3000 [for] the mitigation expert. *But he needs a mental eval*[*uation*] *as well.*" (Emphasis added). The circuit judge sought clarification, asking, "When you say he needs a mental evaluation, do you mean he is not competent to proceed?" The defense responded, "No . . . under the *Miller* test he is allowed to have a mental expert as well." The circuit judge ultimately ruled that he was treating Dampier's request "as a motion for additional funds, and the Court would deny that motion."

¶70. Under these circumstances, we find that Dampier waived any issue that he was purportedly denied "adequate funds" for his mitigation expert in the circuit court. Consequently we find that he has waived this issue on appeal. As the supreme court recognized in *Alexander*, "[i]t is the moving party's responsibility to obtain a ruling from the trial court on any motions filed with the trial court[,]" *Alexander*, 333 So. 3d at 26 (¶26), and the party's "failure to do so constitutes a waiver of same." *Billiot v. State*, 454 So. 2d 445, 456 (Miss. 1984); *see Bufford v. State*, 191 So. 3d 755, 760 (¶17) (Miss. Ct. App. 2015).

## B. Denial of Additional Mitigation Expert Funding

¶71. Second, even if Dampier had preserved his contention that he was denied adequate funds for his mitigation expert, we find that Dampier wholly failed to show that the trial court abused its discretion in denying any such request. As the supreme court recognized in *Moore*, 287 So. 3d at 920 (¶60), "[t]he question of whether a defendant has a right to [expert]

30

funds is a question left to the sound discretion of the trial court." Further, "[t]he determination of whether a defendant must be provided expert funding is made on a case-by-case basis." *Alexander*, 333 So. 3d at 25 (¶23). "'A defendant must demonstrate a substantial need in order to justify the trial court expending public funds for an expert to assist the defense.'" *Id.* (quoting *Richardson v. State*, 767 So. 2d 195, 198 (¶10) (Miss. 2000)). As such, the defendant is required to "'come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial.'" *Id.* (quoting *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994)). In the *Miller* hearing context, the supreme court specifically recognized that "[t]his Court has 'never held that expert testimony is required in a *Miller* hearing.'" *Id.* at (¶24) (quoting *Moore*, 287 So. 3d at 920 (¶61)). Rather, "'[t]he determination of an offender's potential for rehabilitation under the *Miller* factors is left to the sentencing authority.'" *Id.*

¶72. In *Alexander*, the supreme court found on certiorari review that the trial court acted within its discretion in denying the defendant's motion for expert funds to hire a mitigation investigator for his *Miller* hearing after his life-without-parole sentence as a habitual offender was set aside by the trial court. *Alexander*, 333 So. 3d at 21 (¶¶1-2). The Court of Appeals had determined that the trial court abused its discretion in denying "adequate" expert funds to support Alexander's defense. *Id.* at (¶1). In reversing that decision, the supreme court agreed with the dissent that "Alexander failed to meet his burden of providing the circuit court with concrete reasons for requiring expert assistance; instead, Alexander offered only

31

unsubstantiated assertions that expert assistance would be beneficial." *Id.* at 25 (¶22) (citations and internal quotation marks omitted). We find the same principles applied by the supreme court in *Alexander*, apply here.

¶73.    The *Alexander* court began its analysis by observing the defense's delay in seeking expert funding. *Id.* at (¶26). The supreme court pointed out that "this matter sat on the trial court's docket for almost four years from the time Alexander's attorney was retained until the time the *Miller* hearing was finally conducted." *Id.* Similarly, although Dampier's counsel sought funding for "expert assistance in the field of mitigation investigation" in August 2016, following that, the record reflects that Dampier's *Miller* sentencing hearing was continued several times because defense counsel had not yet retained a mitigation expert. Finally, three years later, in 2019, Dampier's new lawyer filed an amended motion for funds to retain Hoff as a mitigation investigator, and the circuit court awarded $3,000 for the defense to retain Hoff. Then, as detailed above, after mentioning to the circuit court that Hoff required more funds, defense counsel never followed through on this vague request at all. Further, despite the fact that Dampier had been awarded $3,000 for Hoff's services, there is no indication in the record that Hoff produced any report encompassing the $3,000 worth of work she had already performed, nor did Hoff testify at trial. Under these circumstances, we find that Dampier wholly failed to demonstrate a "substantial need" for additional funding for a mitigation expert that would "justify the trial court expending public funds for an expert to assist the defense." *Id.* at (¶23).

¶74. Dampier cites *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985), for the general proposition that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." But in *Alexander*, the supreme court specifically recognized that it "has never interpreted *Ake* to mandate the appointment of a mitigation expert or investigator for sentencing in capital trials." *Alexander*, 333 So. 3d at 28 (¶38).

¶75. Instead, the supreme court reiterated that "[w]here a defendant offers no more than undeveloped assertions that the requested assistance should be beneficial, no trial court is under an obligation to provide him with fishing equipment[.]" *Id.* (internal quotation marks omitted) (quoting *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991)). The supreme court also recognized that although "there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused[,] . . . "[t]*hose cases can only be left to the discretion of the trial court, and they will be rare*." *Id.* at (¶39) (emphasis added) (quoting *Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984)). The supreme court also found relevant that Mississippi "case law routinely has placed the burden of mitigation investigation largely on defense counsel." *Id.* at (¶40).

¶76. In light of these principles, the *Alexander* court observed, "Here, the record does not indicate whether defense counsel ever attempted to conduct any sort of mitigation investigation on his own[,]" *id.* at 29 (¶41), and "Alexander's reasons for needing expert

33

funds never developed beyond the level of general speculation." *Id.* at 26 (¶29). The same is true for Dampier. In seeking additional funds for the mitigation investigator, defense counsel told the circuit court that Hoff "just said she needed to interview four more people in [Dampier's] family, and she was having issues with interviewing his mother." There is no indication that defense counsel attempted to interview these witnesses, or "conduct any sort of mitigation investigation on her own." *Id.* at 29 (¶41). Nor did Dampier's counsel offer any reason why she could not do so.

¶77. Further, the general reasons Dampier submitted in his 2019 amended motion for expert mitigation investigation funds were nearly identical to the inadequate reasons submitted by the defendant in *Alexander*, namely: (1) "Every aspect of Dampier's life from conception to the present day must be investigated and this investigation must precede determination of a mitigation case theory"; (2) "[a] social history investigation is not within the expertise of a lawyer"; (3) the same American Bar Association guidelines for death-penalty cases should apply, which "specifically call for 'a mitigation specialist'"; and (4) Dampier is indigent. *Cf. Alexander*, 333 So. 3d at 26 (¶27) (reasons number 3, 4, 6, and 7). Just as the supreme court found in *Alexander*, we likewise find that Dampier's "reasons for needing expert funds never developed beyond the level of general speculation." *Id.* at (¶29). Accordingly, we find no abuse in the circuit court's decision denying any additional mitigation investigation funds.

### C. Additional Funds for Dr. Criss Lott

¶78. In the interest of clarity, we recognize that Dampier also requested funds to obtain funds for a psychologist, and the circuit court awarded him $1,000 to retain Dr. Lott to evaluate him with respect to the *Miller* factors, as we detailed above. When Dampier subsequently requested additional funds to pay Dr. Lott's $3,000 fee, the circuit court denied that request. Dr. Lott was then retained by the defense through grant funding from the Southern Poverty Law Center, and he testified at Dampier's *Miller* sentencing hearing.

¶79. In his appellant's brief, Dampier makes no specific contentions regarding the adequacy of the funds the circuit court allocated for Dr. Lott. In his reply brief, although Dampier generally asserts that "[t]he [circuit] court abused its discretion in denying [him] funding" to "prepare his mitigation case," he addresses only the specifics of his original motion requesting funding for Hoff as a mitigation investigator. Dampier offers no specific argument regarding his request for funds for a psychologist or for Dr. Lott in particular. We therefore find that Dampier waived any purported assignment of error with respect to expert funding for a psychology expert. *See* M.R.A.P. 28(a)(7).

¶80. Even if Dampier had raised this issue with respect to Dr. Lott, and demonstrated a "concrete need" for expert funds for a psychology expert, he must also show he "[was] prejudiced by the denial of expert assistance to the extent that he . . . [was] denied a fair trial." *Townsend v. State*, 847 So. 2d 825, 829 (¶13) (Miss. 2003); *see Barnett v. State*, 192 So. 3d 1033, 1039 (¶19) (Miss. Ct. App. 2015). In this case, Dampier suffered no prejudice at all. Dr. Lott testified at Dampier's *Miller* sentencing hearing and was paid through

funding from the Southern Poverty Law Center. Thus, we find that any contention that Dampier was denied his Sixth and Fourteenth Amendment rights with respect to funding for Dr. Lott is without merit.

¶81. For all the reasons discussed above, we find no abuse of discretion in the circuit court's decision denying Dampier's motions for expert funds.

> **IV. Whether the circuit court applied the correct legal standard and considered the *Miller* factors in sentencing Dampier to life without parole.**

¶82. Dampier asserts that the circuit court applied the "wrong legal standard" in sentencing him to life without eligibility for parole. We find this assignment of error without merit.

¶83. The supreme court explained in *Parker*, that "Miller does not prohibit sentences of life without parole for juvenile offenders. Rather, it 'requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Parker*, 119 So. 3d at 995 (¶19) (quoting *Miller*, 567 U.S. at 480). "The *Miller* Court identified several factors that must be considered by the sentencing authority" *id.*, including:

- the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences";

- the defendant's "family and home environment";

- "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him";

- whether the defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and

- whether the circumstances suggest that there is a "possibility of rehabilitation."

*Id.* at 995-96 (¶19) (quoting *Miller*, 567 U.S. at 477-78). "[T]he burden rests with the juvenile offender to convince the sentencing authority that *Miller* considerations are sufficient to prohibit a sentence of life without parole." *Dotson*, 328 So. 3d at 667 (¶29) (internal quotation marks omitted) (quoting *Wharton*, 298 So. 3d at 927 (¶25)). Lastly, as noted above, "whether the trial court applied the correct legal standard is a question of law subject to de novo review . . . . If the trial court applied the proper legal standard, its sentencing decision is reviewed for an abuse of discretion." *Chandler*, 242 So. 3d at 68 (¶7) (citations omitted).

¶84. Dampier asserts that the circuit court applied the wrong legal standard because the judge expressed skepticism and, perhaps, frustration, about Mississippi's parole practices when addressing the rehabilitation *Miller* factor and Dr. Lott's opinion that Dampier "has the capacity, both intellectually and emotionally, to understand one mistake and you're back forever."[9] According to Dampier, the circuit judge's comments were contrary to the

_____

[9] Specifically, the circuit judge was expressing disagreement with Dr. Lott's testimony "where he basically said one mistake and you're back forever, talking about parole. . . . I like Dr. Lott . . . but he's wrong on that[.]" The circuit judge then said:

*Montgomery* Court's observation that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole . . . [thus] ensur[ing] that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 577 U.S. at 212.

¶85.    We recognize that the circuit judge's observations about parole could be viewed as criticism of a distinct function of the parole board, the entity vested with the "exclusive authority over the grant or denial of parole," *Wilde v. State*, 303 So. 3d 792, 795 (¶11) (Miss. Ct. App. 2020), *cert. denied*, 303 So. 3d 421 (Miss. 2020), by the Mississippi Legislature. *See* Miss. Code Ann. § 47-7-17 (Rev. 2015).  Although perhaps unintentional, we find such commentary inappropriate.  We, as judges, must bear in mind that each branch of government is coequal; no branch can properly function without the other branches, and comity and mutual respect among these branches is an essential aspect of our tripartite system of government.  *See Jones v. City of Ridgeland*, 48 So. 3d 530, 535-36 (¶¶8-9) (Miss. 2010).

¶86.    Nevertheless, we do not find that the circuit judge's unnecessary commentary

---

This Court does not live in a vacuum, and I've spent 20 years dealing with the Department of Corrections.  Being put on parole is a free pass to free walk on the streets of this community. Too many times this Court has had people that not only committed crimes but were convicted of the crimes while they were on parole only to be told by members of the parole board, We're not revoking the parole. And people can say—both of them can say what they want. This Court knows, if this Court grants parole to Mr. Dampier, he will be paroled within the next six months.

amounted to "reversible error" or the application of the "wrong legal standard" in this case. On the contrary, based upon our review of the record, we find that Dampier was provided a full and fair evidentiary hearing. He was represented by counsel, and he presented the testimony of Sergeant Apostolidis, who testified about his interactions with Dampier at the Rankin County Jail, and the expert testimony and report of Dr. Lott, who was accepted as an expert in forensic psychology. The record reflects that in accordance with *Miller* and *Parker*, the circuit judge considered and analyzed each of the *Miller* factors based on the testimony and evidence presented at the hearing. We find that the circuit court applied the correct legal standard.

¶87. Dampier also asserts the circuit court applied the "wrong legal standard" in addressing the *Miller* factors because it "disregarded the evidence presented and relied on a subjective view of the case" and "refused to give mitigating weight to the mitigation presented." We find these assertions without merit. As we address below, we find that the circuit court appropriately considered each of the *Miller* factors and did not abuse its discretion in sentencing Dampier to life without parole. *See Chandler*, 242 So. 3d at 68 (¶7). We turn now to a discussion of the five *Miller* factors.

### Age and its Hallmark Features

¶88. Dampier asserts that the circuit court did not properly take into account his age—sixteen at the time of the crime–in addressing this *Miller* factor. We find that this assertion is unsupported by the record. The circuit court recognized that Dampier was

39

sixteen when the crime was committed and then addressed the "hallmark features" of adolescence, including impetuosity, immaturity, and a failure to appreciate the risks of the crime. The circuit court determined that Dampier's crime was not "an impetuous crime," but rather was planned and executed with "thought and care." Further, the circuit court recognized the evidence that Dampier was mature for his age and had "above average intellect;" and that Dampier knew the risks and consequences of his crime because he tried to shield his girlfriend from them.

### Family and Home Environment

¶89. Dampier asserts that the circuit court wrongly "refus[ed] to consider [Dampier's] loving family as mitigating." The circuit court recognized that Dampier came from a loving home environment, and then compared it to the "horrible circumstances" surrounding the defendant's home life in *Jackson v. Hobbs*, No. 10-9647, *Miller's* companion case. *See Miller*, 567 U.S. at 478 (recognizing that Jackson's home life was "immers[ed] in violence"; his mother and grandmother had both shot individuals in the past). The circuit court did not weigh this factor in Dampier's favor, reasoning that despite his loving family, Dampier still turned to crime. We do not find the circuit court abused its discretion in making this assessment. *See Shoemake v. State*, 323 So. 3d 1093, 1103 (¶35) (Miss. Ct. App. 2019) (finding no abuse of discretion in the trial court's assessment of the home environment *Miller* factor where the court recognized that "by all accounts, [the defendant] comes from a stable and caring family" in comparison to the defendants in *Miller* and *Jackson* who "did not have

40

the benefit of such stability" and ultimately concluded that Shoemake should be sentenced to life without parole).

## Circumstances of the Crime

¶90.    Dampier asserts that the circuit court ignored the circumstances of the crime in finding that this factor weighed against Dampier because the evidence showed that Dampier did not shoot McGuffee.  But the circuit court did not find that Dampier shot McGuffee.  Rather, the circuit court considered the circumstances of the crime, "including the extent of [Dampier's] participation in the conduct" and any peer pressure may have affected him. *See Parker*, 119 So. 3d at 995-96 (¶19) (quoting *Miller*, 567 U.S. at 477).  The circuit court found that there was no evidence of peer pressure in this case, and found that by "one account [(Harth's testimony)] [Dampier] was aware they were going to rob," and by Dampier's own account, "he knew . . . Rogers had a pistol."  Indeed, as we have detailed in Part II above, Dampier drove Rogers to Five Star Auto, blocked the gate to Five Star Auto during the robbery, and drove the stolen Jeep Cherokee from the lot after McGuffee had been murdered.  And Harth testified not only that Dampier knew they would be robbing McGuffee but also that McGuffee knew Rogers, so McGuffee would have to be killed in the process.  The circuit court concluded that Dampier's involvement in the robbery and murder weighed against a life-with-eligibility-for-parole sentence.  We find no abuse of discretion in the circuit court's determination under these facts.

## Incompetencies of Youth

41

¶91. Dampier does not take issue with the next *Miller* factor, "whether Dampier might have been charged or convicted of a lesser offense if not for the incompetencies associated with youth," and we find no abuse of discretion in the circuit court finding that this factor did not weigh in favor of Dampier. In reaching this determination, the circuit court noted that Dampier had the "presence of mind" to hire attorneys for his defense, and "to fire his attorney because he did not like the plea negotiations."

### Possibility of Rehabilitation

¶92. Dampier asserts that the circuit court disregarded Sergeant Apostolidis's testimony in finding that the rehabilitation factor did not weigh in Dampier's favor. The record does not support Dampier's assertion. Noting that Sergeant Apostolidis testified that "[Dampier] is learning how to follow the rules," the circuit court acknowledged that "the Court appreciates Sergeant Apostolidis's testimony." But the circuit court further recognized that "this Court doesn't have the luxury of finding out whether or not [he's] learning. After almost [seventeen] years of incarceration, this Court cannot take the chance with the community that somebody can learn." The circuit court also heard testimony about Dampier's numerous violations and infractions while at MDOC and the Rankin County Jail and observed that these encounters "lead[] the Court to conclude that Mr. Dampier likes to impose his will where possible."

¶93. Dampier also asserts that the circuit court did not take into account Dr. Lott's testimony or report in assessing the rehabilitation factor. We find this assertion without

merit. The circuit court presided over the hearing in which Dr. Lott testified at length; made certain Dr. Lott's report was admitted into evidence; listened to closing arguments in which Dr. Lott's report and opinions were addressed at length; and reviewed the exhibits entered into evidence, including Dr. Lott's report, prior to announcing his ruling. We find no abuse of discretion in the trial court's determination that this factor did not weigh in Dampier's favor.

¶94. In sum, we find that the circuit court properly considered all of the *Miller* factors and did not abuse its discretion in sentencing Dampier to life without parole.

## CONCLUSION

¶95. For all the reasons addressed above, we affirm the circuit court's judgment sentencing Dampier to life imprisonment without eligibility for parole.

¶96. **AFFIRMED.**

**BARNES, C.J., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION. McDONALD AND EMFINGER, JJ., NOT PARTICIPATING.**

**WESTBROOKS, J., DISSENTING:**

¶97. I disagree with the majority opinion, which denies Dampier's statutory right to sentencing before a jury and affirms the circuit court's judgment. Dampier's right to be sentenced by a jury is evident in the plain language of Mississippi Code Annotated section 99-19-101 (Rev. 2020) by Mississippi's post-conviction relief (PCR) statutes. Furthermore,

Dampier's vacated sentence requires that he be sentenced under the statutory scheme as the Legislature has proscribed. Finally, even current Mississippi Supreme Court precedent requires Dampier to be sentenced by a jury. Because of these reasons, I must respectfully dissent.

¶98. On August 29, 2006, Dampier was convicted by a jury for capital murder for his role in a robbery that ended a man's life. He was sixteen years old at the time of the crime. On the same day, Dampier was sentenced by the trial court judge (not a jury) to life without parole. This was the only sentence available to him in 2006 since Dampier, as a juvenile, was not eligible the death penalty. The Mississippi Supreme Court affirmed this sentence in 2008. In 2012, the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), barred mandatory life-without-parole sentences for juveniles. Afterward, Dampier petitioned the Mississippi Supreme Court for leave to file a motion for PCR. The Supreme Court granted his petition on November 13, 2014. On September 25, 2015, the Rankin County Circuit Court vacated Dampier's sentence.

¶99. Dampier requested in pre-hearing motions that he receive a jury sentencing per Mississippi Code Annotated section 99-19-101. This request was denied, and Dampier was sentenced by the circuit court judge in February 23, 2021. Dampier appeals the denial of his request to be re-sentenced by a jury and raises several other issues. I address only the issue of re-sentencing by a jury in this dissent.

¶100. Let me acknowledge my position in *Jones v. State*, 285 So. 3d 626 (Miss. Ct. App.

2017), in which I stated that a *Miller* hearing did not require a jury. *Id*. at 634 (¶27). Further

analysis of this issue in isolation from the larger issues at play in *Jones* has caused me to

reconsider this position. In *Jones*, I analogized a *Miller* hearing to a sentencing-enhancement

statute, where factual findings were required to be conducted by the jury, and the judge was

allowed to implement the sentence. The United States Supreme Court has since clarified that

"a separate factual finding of permanent incorrigibility is not required" in *Miller* hearings.

*Jones v. Mississippi*, 141 S. Ct. 1307, 1319 (2021). Because this holding would remove the

jury entirely from the proceedings, and because further analysis by our Court of the statutory

right to a jury in *McGilberry* and *Wharton* has raised new issues, I must state that my prior

opinion has changed. After further consideration, it is evident that Dampier's sentencing at

his *Miller* hearing should be imposed under the criminal statutory scheme and not through

the PCR statutes because (1) the plain language of the criminal statute supports this

construct; (2) his sentence was vacated, and therefore it was as if it never existed; and (3)

current caselaw supports his right to be sentenced by a jury.

¶101. The pertinent portion of section 99-19-101(1), which governs sentencing in capital

offenses, states:

> (1) Upon conviction or adjudication of guilt of a defendant of capital murder
> or other capital offense, the court shall conduct a separate sentencing
> proceeding to determine whether the defendant should be sentenced to death,
> life imprisonment without eligibility for parole, or life imprisonment. The
> proceeding shall be conducted by the trial judge before the trial jury as soon
> as practicable. **If, through impossibility or inability, the trial jury is unable
> to reconvene for a hearing on the issue of penalty**, having determined the

45

guilt of the accused, **the trial judge may summon a jury to determine the issue of the imposition of the penalty**. If the trial jury has been waived, or if the defendant pleaded guilty, the **sentencing proceeding *shall* be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing**.

Miss. Code Ann. § 99-19-101(1) (emphasis added). Our Supreme Court in *Moore v. State*, 287 So. 3d 905 (Miss. 2019), expressly stated that this section "is unambiguous" and "uses mandatory language requiring that a separate sentencing hearing shall take place '[u]pon conviction or adjudication of guilt of a defendant of capital murder . . . before the trial jury as soon as practicable.'" *Id*. at 918 (¶51) (quoting Miss. Code Ann. § 99-19-101(1)). *Wharton v. State*, 298 So. 3d 921 (Miss. 2019), of course, holds that "Mississippi's PCR Act provides this opportunity to prisoners . . . whose convictions and sentences were final when *Miller* was decided." *Id*. at 927 (¶26) (citing Miss. Code Ann. § 99-39-5(1) (Rev. 2015)). Dampier has a statutory right to jury re-sentencing under the clear language of section 99-19-101 since he (and the State) did not waive this right in writing.

¶102. The majority and *Wharton* characterize Dampier's sentencing as "final" and thus capable of review under the PCR statutes, *id*.; see *ante* at ¶39; however, I disagree with this depiction. When *Roper* and *Miller* issued from the United States Supreme Court, the decisions gave the sentencing authority another sentencing option that was not previously available for juveniles. Courts previously had operated under a misunderstanding about what the Eighth Amendment required, but its true interpretation has since been revealed by these

46

cases. Now that the Supreme Court has clarified what the Eighth Amendment actually stands for, the subsequent *Miller* hearing clearly is not a correction of a sentence, and it is not a "redo" of a sentence. It is an initial application of what the Eighth Amendment held all along but what was just recently illuminated. To say that the criminal case is final does not comport with the fact that a new remedy is available to juvenile defendants through this Eighth Amendment clarification from the United States Supreme Court.

¶103. Additionally, even our Supreme Court has recognized that "[a] *Miller* hearing is a specialized proceeding . . . a judicial intervention." *Cook v. State*, 242 So. 3d 865, 877 (¶44) (Miss. 2017). The Court also acknowledged that the hearing required by section 99-19-101 "is a statutory procedure established by the Legislature in the exercise of its authority to set sentences for criminal offenses." *Id*. The Attorney General, in its manual on State Post-Conviction Remedies and Relief, characterizes PCR remedies as "an independent civil action, *not* a post-sentencing phase of the original criminal case." Mississippi Attorney General, Post-Conviction Manual § 27:1, at 725 (emphasis added). Moreover, the purpose of the PCR statutes, as expressed in the Mississippi Code, states:

> *Direct appeal shall be the principal means of reviewing all criminal convictions and sentences*, and the purpose of this article is to provide prisoners with a procedure, limited in nature, to review those objections, defenses, claims, questions, issues or errors which in practical reality could not be or should not have been raised at trial or on direct appeal.

Miss. Code Ann. § 99-39-3(2) (Rev. 2020) (emphasis added). Since a *Miller* hearing is a specialized proceeding to address a sentencing option that previously existed under the

47

Eighth Amendment but was only recently clarified, it should be construed as a post-sentencing phase of the case to be considered under the criminal statutory scheme, as our statutes require.

¶104. Furthermore, Dampier's sentence was vacated. When a sentence is vacated it is made void. (*See Vacate*, Blacks Law Dictionary (11th ed. 2019) ("1. To nullify or cancel; make void; invalidate."). When a sentence is vacated it should be adjudicated *ab initio*. To vacate his sentence means the sentence never occurred, and Dampier's *Miller* hearing sentencing *is* his original sentencing, and is not a resentencing. The Supreme Court seems to acknowledge this understanding in *Wharton* when it concluded "that it is error for our trial courts to vacate a juvenile's original life-without-parole sentence (or life sentence) before conducting a *Miller* hearing." *Wharton*, 298 So. 3d at 927-28 (¶29). The majority suggests that I ignore the precedents in cases that have disregarded the circuit court's error of vacating the sentence. *Ante* at n.6. But instead I acknowledge these precedents and point out that they are incongruous with both what our Supreme Court has concluded and the common understanding of vacating sentences. Although I acknowledge the *Wharton* Court's conclusion may apply to a limited number of cases moving forward, I do not believe this Court should continue to ignore this incongruity. Because Dampier's sentence was vacated—voided—I believe he should receive and is entitled to receive his sentence before a jury, as section 99-19-101 mandates.

¶105. Finally, Dampier should receive a trial before a jury under section 99-19-101 because

he never received a jury trial at his initial phase of sentencing like the defendants did in *Wharton* and *McGilberry*. Both of these cases affirm the statutory right to be sentenced (at least once) by a jury. The *Wharton* court stated, "Wharton received a jury sentencing hearing as required by Section 99-19-101(1). Thus, unlike in Moore, there was no statutory violation in this instance." *Id.* at 925 (¶20). The *McGilberry* court agreed, finding "[t]o be sure, as a capital offender, McGilberry had a statutory right to be sentenced by a jury. . . . And this right was indeed provided to him. In compliance with Section 99-19-101, upon his conviction of four counts of capital murder, the trial court conducted a separate sentencing hearing before a jury." *McGilberry v. State*, 292 So. 3d 199, 207 (¶34) (Miss. 2020).

¶106. Here, there is no indication in the record that Dampier waived his statutory right to a jury at first hearing either orally or in writing, as required by the statute. At the time of Dampier's sentencing, as the majority states, it was common practice to not have jury sentence capital defendants with only one sentencing option, because "[c]alling a jury for sentencing when there was only one option was considered a "meaningless, procedural step" elevating "form over function." *See Pham v. State*, 716 So. 2d 1100, 1104 (¶24) (Miss. 1998); *ante* at ¶44. But our Supreme Court explicitly held in *Moore* that *Pham* does not control in cases involving juveniles since more than one sentence is possible for them in capital cases. *Moore v. State*, 287 So. 3d 905, 919 (¶55) (Miss. 2019).

¶107. With this background in mind, this Court erroneously held in *Martin* and in *Booker* that the distinction between those who were sentenced by jury originally and those who were

not has no "legal significance." *Martin v. State*, 329 So. 3d 451, 457 (¶14) (Miss. Ct. App. 2020), *reh'g denied* (Sept. 14, 2021), *cert. denied*, 329 So. 3d 1201 (Miss. 2021); *Booker v. State*, No. 2018-CA-00664-COA, 2019 WL 13161100 at *6 (Miss. Ct. App. Sept. 3, 2019). This holding is not in harmony with of the Supreme Court's declaration in *Moore*, which states that section 99-19-101's "plain language requires all capital offenders—without exception—to be sentenced by a jury." *Moore*, 287 So. 3d at 919 (¶58). *McGilberry* and *Wharton* also clearly recognize the statutory right to be tried by jury at initial hearing - which in those cases was met. *Wharton*, 298 So. 3d at 925 (¶20); *McGilberry*, 292 So. 3d at 207 (¶34). If there were no legal distinction between those sentenced with a jury and those sentenced without, the Supreme Court would not have expressly recognized the right to be sentenced by a jury in three strongly worded separate opinions.

¶108. Dampier's case presents a set of unique and unusual circumstances. Dampier *never* received sentencing by a jury, which again, should have been required under the plain language of section 99-19-101. This point is especially true since his sentence was vacated. His right to a jury sentencing is also supported by existing Mississippi Supreme Court precedent. Accordingly, his sentence should be reversed and the case remanded for a jury re-sentencing. Therefore, I respectfully dissent from the majority's decision to affirm the circuit court's judgment in this case.